WILLIAM HOUSTON AND OTHERS, AND FRANCIS FISK AND OTHERS, PLAINTIFFS IN ERROR, v. THE CITY BANK OF NEW ORLEANS.

The District Court of the United States, sitting in bankruptcy, had power to decree a sale of the mortgaged property of a bankrupt; and if there are more mortgages than one, and the proceeds of sale are insufficient to discharge the eldest mortgage, the purchaser will hold the property free and clear of all encumbrances arising from the junior mortgage.

THIS case was brought up, by a writ of error issued under the twenty-fifth section of the Judiciary Act, from the Supreme Court of the State of Louisiana.

The facts in the case are fully set forth in the opinion of the court.

It was argued by *Mr. Johnson* and *Mr. Clay*, for the plaintiffs in error, and *Mr. Sergeant*, for the defendants in error.

*Mr. Johnson* stated the case on behalf of the plaintiffs in error, who were purchasers of certain property which was exposed to public sale by order of the District Court of the United States. The question was, whether a mortgage upon the property, held by the City Bank, was an existing lien at the time of filing the bill, or whether the lien had been destroyed by the proceedings in bankruptcy.

He then proceeded to lay down four propositions : —

1. That the District Court had jurisdiction to decree a sale, with or without the assent of the mortgagee, and the purchaser gets an absolute title against all persons claiming by or through the bankrupt.

2. If wrong in this proposition, and the District Court had no authority to sell without the assent of the mortgagee, then it had power to sell with that assent; and as the property did not sell for enough to pay the first mortgagee, who assented to the sale, the title to the purchaser becomes absolute.

3. If wrong in this, then that the conduct of the City Bank, the junior mortgagee, furnishes presumptive evidence of its assent also to the sale.

4. That the cancellation of the mortgage of the bank under a mandamus, as between the mortgagee and those claiming under him, vested an absolute title in the purchaser.

(As the decision of the court turned entirely upon the first point, the argument of *Mr. Johnson*, and also those of the other counsel, upon the other points, are omitted.)

I. The District Court had power to decree a sale, with or without the assent of the mortgagee. This involves two branches : —

1st. Had Congress the constitutional power to pass such an act ?

2d. Did they, by the act, vest the power in the District Court ?

1st. The power of Congress was denied during the passage of the act, but this court have affirmed it by decreeing under it. It is only necessary to refer to the language of the Constitution, and it will be seen that the terms of the grant are of the broadest character. The power is to pass all laws; the only restriction is that they shall be uniform. But as the court has already decided the constitutionality of the law, by acting under it, the inquiry need not be pursued.

2d. Did Congress, by the act, vest the power in question in the District Court ?

We have seen, that the power of Congress over the subject of bankruptcy is total and absolute, with the single limitation, that the laws must be uniform ; and an examination of the law will show that Congress intended to exercise the whole of its power. This is a cardinal principle in the interpretation of the statute. If the legislative power was intended to be exhausted, we can judge how much was given to the courts. We say, that jurisdiction over the whole subject of bankruptcy was conferred.

The title of the act is coextensive with the power of Con-

gress. It is "to establish a uniform system," &c. The first section is so, too. The second avoids certain deeds, &c., and the proviso says that liens or mortgages, &c., shall not be impaired. The only effect of this is to preserve the rights themselves; but it gives no direction how the rights are to be enforced. It means that the courts of the United States are to protect them, as well as the State courts; and the uniform rule by which this is to be done can only be found in the former, acting as they do from one common source of construction and authority, namely, this court. The exception itself in favor of these rights shows that Congress intended to occupy the whole ground. Every thing which is not excepted passes under the act. The rights themselves, therefore, being the only matters which are excepted, the mode of enforcing those rights by an application to the State courts is not saved. Not being excepted, it is gone. If Congress had intended that the State courts should retain their jurisdiction over mortgages, and have the power of foreclosing them, the law would have said so. The argument upon the other side must be, that all these encumbrances were excluded from the operation of the law entirely. But the bankrupt is obliged to make a return of all his property of every kind, under the penalty of losing the benefit of the law. He must include his mortgaged property, and the whole must be adjudicated by one head. Other sections, in addition to the proviso, show a design of giving the control of the whole subject to the District Court. All property of the bankrupt, all his rights in every species of estate, real, personal, and mixed, all his debts, are portions of the matter which is thrown into this court. Debts are provable and proved there. If such a surrender be not made, the bankrupt is not to have the benefit of the act. This shows that all the debts are to be paid out of the property. The fifth, seventh, ninth, tenth, and fifteenth sections all tend to show the control of the District Court over the entire subject; the sixth and eighth, more especially. Let us revert to the question before the court, and see what it is. Had the District Court authority to decree a sale of mortgaged property, so as to give the purchaser a good title? This is the question. The language of the Constitution is very different as to the two subjects of naturalization and bankruptcy. Over the first the power of Congress is only to establish a uniform rule, leaving it to the State, as well as federal, courts to enforce the rule. The jurisdiction of State courts is not taken away. But over the subject of bankruptcy the power is to establish uniform laws. They must be the same everywhere. It would be strange, if the United States courts were not vested with power to decide all questions

which may occur under these laws.    The object was uniformity.    In fact, this was the condition upon which the power was held by the federal government.    The act of Congress says that the District Court shall have jurisdiction over all matters arising under the act, all "cases and controversies," all "acts, matters, and things," &c., until a final distribution.    Is this a power merely to sell an estate subject to liens?    If a clear title could not be obtained, the property would be sacrificed.    The fact that claims may exist upon the property, and the legality of those claims, are wholly different things.    A bankrupt may make fraudulent mortgages, or give illegal claims to his wife.    Who is to decide the question of their legality, unless it be the District Court?    Until the question was settled, the property would not sell.    So much for the sixth section.    But the eighth removes all doubt, for it allows the Circuit Court to entertain a bill in equity in all cases arising under laws, treaties, &c.    The third section vests the rights of a bankrupt in the assignee.    Could he not have filed a bill in the Circuit Court to have the mortgaged property sold?    The mortgagee also might file a bill.    If the assignee were to assert, and prove, that the mortgage was void, either in his bill or answer, would not the court set it aside?    But the jurisdiction of the Circuit Court is concurrent with the District Court, not superior to it.    The District Court has, therefore, the same power.

The decisions of this court in 3 Howard, 203 and 426, settle the question.    But the opinion is said to be *obiter*.    It is strange, that the highest court in the land, vested with power to decide constitutional questions, should listen for many hours to arguments, write out its opinion, and that such opinion should be disregarded as *obiter*.    It was wise to settle the law then.    As soon as the act of 1841 passed, numerous cases occurred under it.    Doubts grew up.    Judges decided differently.    Property to the amount of thousands of dollars was distributed under the law.    It was the duty of this court, as guardians of the commonwealth, to settle all these difficulties, and guard against conflicts between the authorities of the States and United States.    But the doctrines asserted in Ex parte Christy, 3 Howard, 203, have ceased to be *obiter*.    Even if we admit that the precise point now before us was not before the court in that case, yet it came up afterwards, in 3 Howard, 426.    At page 434, the court say, that they concur in the principles and reasoning of Ex parte Christy.    The dismission of the bill depended upon the case coming within the preceding case of Ex parte Christy, and the decision was made upon this ground.    This was not, therefore, an *obiter* opinion.    At page 440, Mr.

Justice Catron never doubted the power of the District Court over mortgaged property, provided the jurisdiction of a State court had not first attached. As this did not occur in the present case, it appears to be free from all objection.

*Mr. Sergeant,* for defendants in error.

This case is brought to this court under the twenty-fifth section of the Judiciary Act, and the only point open is the one which arises under that section. It has been said by the counsel on the other side, that the whole case is before this court, and the authority of Osborne *v.* Bank of United States cited in support of the position. But that case was not brought here under the twenty-fifth section. This court cannot decide that the court below was right on the constitutional point, and then proceed to reverse the decision for other reasons. Only one of the points stated by the opposite counsel is before the court now. The other three are not. All questions relating to the respective rights of different mortgagees is a Louisiana question, to be decided by the State courts. Whether or not the bank assented to the sale is not a point which this court is at liberty to examine under the record, nor whether the proceedings in the State courts, in order to obtain the cancellation of the mortgages, were regular or not. These are questions for the courts of the State exclusively. The only question now before us is the right of the District Court, under the act of Congress, to force to a conclusion all matters between a mortgagor and mortgagee. How has the exercise of this power worked in the present case? The bankrupt was worth $350,000, and borrowed $200,000 on mortgage. The property, under the forced sale, sold for $120,000 only, not one third of what the assignee had valued it at. (*Mr. Sergeant* here recited the facts in the case.)

The question before us may be divided into two branches: —

1st. Had the District Court jurisdiction over mortgages?

2d. Had it jurisdiction in this case, and in the mode pursued?

1st. Before the case of Ex parte Christy, different constructions had been given to the act of Congress, and we are still in the midst of the conflict. Where was the necessity of deciding in advance? The act of Congress could as well be carried out in one way as in the other. If the settlement of questions relating to mortgages had been left to State courts, it would not have protracted the settlement of a bankrupt's estate. The necessity of the case does not demand that this power should be vested in the District Courts. The existence

of different opinions shows a doubt of the existence of such a power; and a decision in favor of this ultra power will make a law odious which was not so before. It makes the law interfere with State jurisdiction. If this mortgage had been left to the ordinary course of proceeding in Louisiana, the case would have been settled long ago. But instead of that, we are here now, disputing about an act of Congress. What is it? The proviso in the second section controls and limits the whole act. It declares that nothing shall annul, destroy, or impair the rights of married women, or liens or mortgages. Without this proviso, the law could not have been passed. It was put in because the States required it to be so. The reservation is, that liens shall not be impaired. Suppose a lien existed upon property, and the person who held the lien was put into possession, and an order of the District Court forces him to sell it when he does not wish to do so. Is not his lien impaired? The creditor is in possession of property, under a contract that he shall keep it until the debtor pays him what is due, and the court sends an officer to take it away. Has he not a less right than the contract gives him? So, also, the construction contended for on the other side requires the District Court to settle the rights of married women. What right has this court to meddle with the subject, whilst a woman is yet under coverture? Who is to represent her? The proviso saves equally rights under contracts and rights under the law. Your aid is not asked to protect them. All liens are preserved which are valid by the laws of the respective States. Who is to judge of their validity? The State courts, or the judges of this court in their circuits? Whichever tribunal decides, it must look only to State laws. Where, then, is the evil of allowing State courts to interpret State laws?

It is not correct to say, as the opposite counsel has done, that where Congress has plenary power and passes an act, therefore the act must be construed to the full extent of the power which Congress possessed. This has not been the doctrine of Congress nor of the people. Half a century ago, this court decided that they would take jurisdiction only so far as Congress had delegated it. The Judiciary Act of 1789 limits the power of this court, which has never gone beyond it. Doubtful words must not be construed to enlarge jurisdiction until the people alter the Constitution of the United States. If there be a doubt, the test must then be applied, whether a necessary implication exists, or whether the laws of the United States can be enforced without the jurisdiction claimed. This is the rule in all cases of limited jurisdiction. Apply it to this case. Has Congress said clearly that this power is given to the Dis-

trict Court? On the contrary, some of the judges of this court have denied the power, which shows that it is not clearly granted.

The second, third, and eleventh sections all have the same object in view, namely, the preservation of rights which exist under State laws; and the only inquiry is into the validity of these rights under those laws. The United States are jealous of their Constitution, and have courts of their own to protect it. Is it unreasonable to concede the same feeling to the States, and to allow their own courts to decide upon rights flowing from State laws? Nobody doubts the correctness of the course pursued by the United States. Why not grant the same to the States?

The third section gives to the assignee all the rights of the bankrupt. Take the case of property pledged for a debt due by a bankrupt, and in possession of the mortgagee. The bankrupt himself has no right to take it out of his possession, except by redeeming it. How, then, can the assignee do it, and exercise greater power than the bankrupt himself? All that the assignee can legally do is to redeem. But the claim here is, that the assignee can bring the unwilling creditor into the District Court, and compel him to sell the property. If there is a loss, on whom will it fall? The creditor must be the only sufferer. So it would be, if family rights were involved. The assignee would look only to the interest of the creditors of the bankrupt, and the rights of the family be wholly disregarded.

2d. Had the District Court jurisdiction in this case, and in the mode pursued?

(*Mr. Sergeant* here objected, that the requisitions of the act had not been complied with, as to the petition, notice, &c.)

In England, the courts order trustees to invest trust-funds in mortgages, and so they do in the United States. Such an investment is generally recognized as a safe place for money. What is a mortgage? It is an estate in land vested in the mortgagee. It may be called a security for a debt, but it is created by a conveyance of the estate. It is true that it is an estate on condition subsequent, but if the debt is not paid, the estate vests in the mortgagee. The relief sought here is to have the property sold. I ask that the contract may be carried out. The nature of a mortgage is explained in 1 Howard, 318; and 9 Wheaton, 489. It is there asserted, that the mortgagor has no right, at law or equity, but to redeem the property by paying the debt. Whilst the mortgagee has two remedies, — namely, by ejectment and bill, — the mortgagor has no right except to redeem. Congress knew this, and vested his right

in the assignee. In Pennsylvania there is no foreclosure of a mortgage. The courts of law furnish the remedy. Our mortgagee can never be obliged to sell. Will you overturn our law of mortgage by ambiguous words? I adhere to the contract in this case. They go out of it. It is at the option of the mortgagee whether to sell or not; but they compel him to sell. The property was worth $ 350,000. Suppose they had waited for a favorable time to sell, instead of putting it up at auction. What good has accrued to any one from so putting it up? None. But the opposite counsel say that this course is recommended by its simplicity. What has this simplicity produced? A long contest in Louisiana, and now here, at a grievous expense. Congress never intended this. Nor did they intend to place the courts of the United States in a position antagonistical to the State courts, and thereby compel the latter to surrender the whole control of the subject. And for what purpose? To promote speedy settlements? The cases under the bankrupt law of 1800 are not yet all disposed of. Now and then we find one walking the earth, like an unquiet ghost.

*Mr. Clay*, for the plaintiffs in error, in reply and conclusion.

Thomas Banks, a citizen of New Orleans, being the owner of a block of buildings in that city, a remarkable edifice, called Banks's Arcade, executed three several mortgages upon it, the first to the New Orleans Canal and Banking Company, the second to the Carrollton Railroad Company, and the third, and last in point of time, to the City Bank of New Orleans, the defendant in this writ of error. These mortgages were executed to secure payment of large sums of money which Banks owed to the respective mortgagees, as stated in the mortgages. On the 30th of July, 1842, Banks filed his petition, in the District Court of the United States, holden in New Orleans, to be declared a bankrupt, under the act of the Congress of the United States to establish a uniform system of bankruptcy. His petition was accompanied by a schedule, exhibiting the names of all his creditors, and a list of all his property; and among his creditors so enumerated is the defendant, for a loan on mortgage and on pledge of stock; and among the property described in the schedule, and surrendered to his creditors, is Banks's Arcade. On the 5th of September, 1842, after due publication and notice served on the creditors resident in the city of New Orleans, (the defendant being one of them,) according to the requisition of the bankrupt act, a decree of bankruptcy was pronounced by the District Court, and F. B. Conrad was appointed assignee of the bankrupt's estate, who qualified, and entered on the duties of his office according to law.

On the 10th of October, 1842, the assignee presented a petition to the District Court, stating that a great portion of the bankrupt's property consisted of large masses, such as the City Hotel, Banks's Arcade, &c., which would sell to greater advantage if subdivided; that the leases granted by the bankrupt were about expiring; and that the interest of the estate would be promoted by leasing out the property for one year, as purchasers would prefer buying with tenants in occupation of the property. A day was fixed, by order of the court, for the hearing of the petition, which was advertised in the newspapers; and on the hearing, the prayer of the petition was granted, and the assignee took possession of Banks's Arcade and the other property of the bankrupt.

Subsequently, the assignee applied to the District Court for an order of sale of the property, exhibited plans for its subdivision, and proposed terms of sale. The court fixed a day for the hearing of the petition, ordered it to be published in the newspapers, and personal notice of it to be served on the mortgagees. On the 6th of January, 1843, the court, after reciting that notices had been published according to the rules of court, and that personal notice had been served on the mortgage creditors, naming them, (and the defendant among them,) pronounced a judgment, that the sale of the property take place in the manner and on the terms proposed by the assignee, on the 15th of February, 1843; and that the mortgages be cancelled, so as to give purchasers unencumbered titles, reserving, however, to the mortgagees respectively, their rights upon the proceeds of sale.

The sale accordingly was effected, by the marshal of the United States, on the day appointed, when the plaintiffs, being the highest bidders, became respectively the purchasers of the several parcels adjudged to them by that officer. The sale was one of the most notorious and attractive that ever took place in the city of New Orleans, from the conspicuous position, great value, and well-known character of Banks's Arcade, &c. It was duly advertised in the newspapers of the city, placarded, and otherwise made public, and brought together a vast multitude. It was conducted with irreproachable fairness, which is not contested at all in the present suit. By the subdivision of the great block of buildings into smaller parcels, they were placed within the reach of a greater number of persons, and consequently excited more competition among persons disposed to purchase. By the large and liberal credits given to purchasers, (which there was no obligation to have done,) the property was also placed in the power of more capitalists and purchasers. From these two causes, it is beyond a

doubt, that the property sold for much more than it would have commanded· if it had been put up in block and sold for cash.

From the ·public advertisement· and the great notoriety of this sale of Banks's Arcade, in the absence of all proof it would· not have been doubted, but it is positively proven in the cause, that the defendant had full notice of the sale. Yet neither the defendant, nor any one of that vast multitude present at the sale, interposed, in any manner whatever, to forbid it, or uttered one word of warning or advice to persons bidding, to prevent their purchasing. And the plaintiffs, so far from supposing that they would be. involved in a tedious and expensive lawsuit about the property they were purchasing, had every reason to conclude that they would acquire a clear, unencumbered, and indisputable title to it.

Still, before they actually paid the consideration money, and received titles for the property purchased, they required of the · assignee the production of the . certificate of the register of mortgages, that there existed no mortgage or other encumbrance on the property, which certificate ·is held by the law and practice of Louisiana to be a perfect security to purchasers against preëxisting liens. The District Court, it has. been seen, had ordered the mortgages (including the defendant's) to be cancelled, prior to the sale, so that purchasers might obtain unencumbered titles ; and what the law, through the tribunals of justice, commands to be done, ought· to be considered and taken as done. But to remove all scruples and quiet all apprehensions, on the ·24th of February, 1843, the court passed an order, at the instance of the assignee, stating that, in pursuance of its order, a sale had taken place, for which sale the· New Orleans Canal and Banking Company, which held the first and oldest mortgage on Banks's Arcade, had given. to the assignee its written consent that its mortgage should be raised, in order that the assignee might pass clear titles to the purchasers; and ordering that the recorder of mortgages should erase from his records the mortgages of the defendant and others.

·· On the ·6th of March, 1843, the assignee presented his petition to the Parish Court for the parish of New Orleans, reciting the proceedings in the District Court, and the refusal of the recorder of mortgages to comply with the order to erase the mortgages; and concluding by praying the court for a. mandamus to compel the register to cancel the mortgages in conformity with. the order of the District Court. The case was elaborately argued for three days, in the Parish Court, which finally ordered the mandamus to be granted. The recorder

appealed from this decision to the Supreme Court of Louisiana; and that court affirmed it. (See 5 Robinson's Reports of cases in the Supreme Court of Louisiana, 49.) Thereupon the recorder erased the mortgages, gave a certificate that no encumbrances existed on the property, and the assignee passed a clear title to the plaintiffs, and received the price from them at which the property had been stricken off, in money and notes, according to the terms of sale.

On the 23d of June, 1843, the New Orleans Canal and Banking Company presented a petition to the District Court, stating the sale of Banks's Arcade, and praying that, as the first mortgagee, the assignee be ordered to pay over to the petitioner the cash proceeds and the notes of the purchasers. The court ordered public notice to be given of this petition, which having been accordingly given, on the 6th of July, 1843, the day fixed for its being heard, the court gave judgment that the assignee pay over to the Canal Bank, holding the oldest mortgage, the proceeds of the sale of Banks's Arcade. The aggregate amount fell far short of what was due to the bank.

On the 5th of January, 1844, the assignee having filed his account of his administration of the bankrupt's estate, so far as he had been able to make progress in it, his account was referred by the court to commissioners, for examination and report. The commissioners proceeded to the adjustment of the assignee's accounts, awarded or adjudged the proceeds of the sale of Banks's Arcade to the New Orleans Canal and Banking Company, as the first mortgage creditor on the property, and reported to the court.

Upon receiving their report, the hearing on it was fixed for the 18th of April, 1844, and notice was ordered to be given through the public papers, and personally, to the resident creditors of the bankrupt, to show cause why the report should not be homologated by the court. Among the creditors personally notified was the City Bank of New Orleans, the present defendant. On the day fixed, the report of the commissioners was homologated by the court.

Throughout the whole proceedings of the District Court, in the case of Thomas Banks's bankruptcy, that court appears to have acted with the greatest caution, and with the most conscientious regard to the rights of mortgagees and all creditors. In the commencement of Banks's action or suit against his creditors, to obtain his discharge, under the bankrupt act of Congress, they were notified by publication in the newspapers, and personally, as required by the act. On the occasion of every important step taken during the progress of the case, the creditors were fully notified, either personally or by publica-

tion in the newspapers, or in both forms, of what was proposed to be done. Thus, when the assignee proposed to have the property subdivided, and, as the leases upon it were about expiring, asked for authority to grant new leases, the court fixed a time for hearing his motion, and ordered public notice thereof to be given in the newspapers. So, when the assignee applied for an order of sale, accompanying his petition with a schedule of the property to be sold, and stating the proposed terms of sale, the court fixed a time for hearing the motion, and ordered that public notice thereof be given in the newspapers, and personally served on the mortgage creditors. So, also, when the New Orleans Canal and Banking Company, after the sale of Banks's Arcade, petitioned the court, as the oldest mortgagee, to have the proceeds of the sale applied towards payment of its mortgage, a day was fixed for the trial of this petition, and the court ordered public notice to be given in the newspapers. And again, after the report was made of the commissioners appointed to settle the assignee's account of the administration of the bankrupt's estate, by which report the proceeds of Banks's Arcade were awarded to the first mortgagee, as they had been previously by the judgment of the court, notice was given to all creditors, through the public papers, and served personally on the defendant, to appear and show cause why the report should not be homologated by the court.

But if the District Court were signally assiduous and untiring in inviting, by repeated notifications, all persons, and the City Bank especially, to come forward and assert their rights, and oppose whatever might unjustly tend to their prejudice, that corporation appears to have firmly resolved to disregard all its friendly summonses. It maintained throughout an obstinate, if not sullen, silence. It determined upon a deliberate, if not masterly, inactivity. It never once, on any occasion, appeared in the District Court sitting in the bankruptcy of Thomas Banks. It did not object to, or contest, the sale of the Arcade, when about to be ordered. It did not forbid the sale, when about to be made. It did not oppose the appropriation of the proceeds of sale towards the payment of the first and prior mortgage. When the report of the commissioners, appointed to settle the accounts of the assignee, was about to be homologated by the court, the defendant did not oppose the slightest obstacle, although that report expressly assigned the proceeds of the Arcade away from his mortgage towards the satisfaction of the elder mortgage. He made no opposition, which is known, to the erasure of his mortgage, either before the Parish Court of New Orleans, or before the Supreme Court of Louisiana. If the defendant entertained any antipathy to

the federal tribunal, the State courts remained open to him; but neither there did he make his appearance, whilst any of the transactions which he now seeks to annul and set aside were in progress. He did not before any State court institute an hypothecary action, or apply for any order of seizure and sale to subject the Arcade to the payment of his mortgage. He applied for no injunction to restrain the proceedings before the District Court, nor to prevent the Parish Court from erasing his mortgage. The defendant was as silent as the grave until after the whole proceedings about the Arcade were closed in the bankrupt court, until after the plaintiffs had bought the property, without warning, paid the purchase-money, received a clear title, and taken a peaceable and quiet, and, as they had every right to suppose, an undisturbable possession, of what they had fairly bought and honestly paid for.

In this stage of the business, when all seemed perfectly settled, and when, according to the ordinary course of human affairs, and the wants of quiet and repose in society, there should be a termination of all controversy, the City Bank of New Orleans for the first time puts itself in motion, and, seeking to disregard, disturb, and set aside all that had been previously done in respect to the Arcade, commences in the Commercial Court of New Orleans its hypothecary action against the plaintiffs in this writ of error, as third parties in possession of the mortgaged property. It does not make defendants to the suit, either the New Orleans Canal and Banking Company, or the Carrollton Railroad Company, both of which, as has been before stated, held mortgages prior in time and dignity to that of the City Bank of New Orleans. It charges no irregularity, imputes no fraud, and does not impeach the fairness of the sale. It is founded exclusively upon the notion, that the highest judicial tribunals of the State and Union had perseveringly and deliberately misinterpreted the bankrupt act; and that, although that act is now dead, and years have elapsed and millions of property have changed hands under faith of the interpretation given to it, it is not now too late to go back and correct the error into which those tribunals have fallen. The court dismissed the action of the City Bank, and it appealed to the Supreme Court of Louisiana. That court, reversing the decision of the inferior tribunal, gave judgment for the City Bank, to reverse which this writ of error is now prosecuted:

I. The first ground on which the plaintiffs rely is, that the first mortgagee, being an acknowledged party to the cause, gave his previous consent and authority to the sale, and, after it was made, petitioned the court to receive the proceeds, and

actually did receive them, towards the satisfaction of his mortgage, and so ratified and confirmed the previous sale.

(As the decision of the court did not turn upon this point, the argument is omitted.)

II. But it is contended that, without any assent of the first mortgagee to the proceedings of the court in bankruptcy, and even in opposition to the protest of that and every other encumbrancer, that court, under the act of Congress, had full and complete jurisdiction over the mortgaged property, had ample power to order its sale, and that the sale, in virtue of its authority, is valid, and binding upon all parties whatever.

Nothing, it would seem, on principle, would be more proper and fitting, than that the assignee of the bankrupt should be invested with all the property, however encumbered, rights, and interests of the bankrupt; that he should have power to sell and dispose of it to the best advantage, making clear titles to the purchasers; and that he should be obliged, at the same time, to show proper regard and pay due respect to all liens and encumbrances existing on the property. In no other way can a unity in the administration of the bankrupt's estate be secured. In no other way can a speedy and definitive settlement of it be effected. If a part of his estate, the unencumbered part only, be subject to the authority of the assignee, and the residue of it, the encumbered part, be beyond his control, and liable to a different and conflicting administration, delay and confusion are inevitable.

What was so manifest and reasonable in itself was not likely to be overlooked by the wisdom of Congress. Accordingly, in the bankrupt act, the assignee is invested with the fullest right and power over the whole estate, rights, and interests of the bankrupt, of whatever kind or nature, to the same extent in which the bankrupt himself held them. (Third section of the act.) And Congress, looking to the interest of all parties to have a speedy settlement of the bankrupt's estate, has provided, (in the tenth section of the act,) that it shall, if practicable, be accomplished within two years after the decree in bankruptcy.

By the second section of the act, it is provided, that nothing in the act contained shall be construed to annul, destroy, or impair any lawful rights of married women or minors, or any liens, mortgages, or other securities on property, real or personal, which may be valid by the laws of the States respectively, and which are not inconsistent with the provisions of the second and fifth sections of the act.

Under this proviso the defendant contends, that, as mortgagee, he is exempted from the operation of the bankrupt

act; that it does not touch or affect him; that the property which is mortgaged to him is beyond the reach or control of the bankrupt court, and that he may proceed when he pleases to enforce his mortgage rights, without regard to the interests of the other creditors of the bankrupt, and without respect to the requirement of the bankrupt act to insure a speedy settlement and close of the proceedings in each case in bankruptcy, within two years, if practicable, after the decree declaring the bankruptcy.

These are high pretensions, and ought to be fully and justly weighed. Undoubtedly, the rights of all mortgagees, in a due execution of the bankrupt act, are to be fully respected and enforced, and are not to be annulled, destroyed, or impaired. But, whilst the most liberal and full effect ought to be given to the part of the act which declares that they shall not be impaired, annulled, or destroyed, full operation should also be allowed to all other parts of the act.

If the act can receive a construction by which the mortgage creditor can be made safe in the receipt of the debt which the mortgage was intended to secure, and other creditors can be allowed to receive what remains of the mortgaged property, after that object is accomplished, that construction would be recommended by justice and equity.

The plaintiffs contend, that the mortgaged property should be fairly administered by the assignee, along with the other property of the bankrupt; that it should be fairly sold, in a manner likely to make it the most productive; and that out of the proceeds the mortgages should be first satisfied, and the residue, if any, be applied to the payment of the general creditors. And this, they contend, is necessary to comply with the provisions of the bankrupt act. Far from annulling, destroying, or impairing the lien, they contend that this course gives to it full and complete effect, securing the identical object for which the mortgage or lien was created.

But the defendant, in effect, contends that the whole property of the bankrupt, as was manifestly intended by the bankrupt act, is not vested in the assignee; that a part of that property, which happens to be mortgaged, is without the power or control of his assignee; that it can only be acted upon and disposed of when the mortgagee pleases; and, consequently, whatever may be its value or amount, whether it exceeds or not the debt which it was intended to secure, it must remain exempt from the power or management of the assignee.

This is not believed to be according to the design of the bankrupt act. That was to subject the whole property of the bankrupt to the payment of all his debts, according to their

priority and privileges. And this design can be best effectuated by subjecting the property to a single and undivided management, under the superintendence of the assignee, acting in obedience to one judicial tribunal.

If the contrary be supposed, — if the mere fact of the existence of a mortgage withdraws the mortgaged property from the control of an assignee, — what might be the consequence ? The mortgage may be illegal and invalid, or may be upon property amounting to a value greatly exceeding the debt intended to be secured by it. Is the property mortgaged under such circumstances to remain beyond the reach of the assignee ? Does not every view which can be taken of the subject lead to the conclusion, that the entire property of a bankrupt, encumbered and unencumbered, should be under the control of the assignee, so as to be administered by him, with due respect to liens or not, as they may happen to exist ?

It is further urged by the defendant, that, whilst his mortgage is to remain sacred and beyond the reach of the assignee, the equity of redemption may be sold ; in other words, that the mortgage property must be sold, subject to the encumbrance. If the existence of a mortgage protects the property against the operation of the bankrupt act, all "lawful rights of married women or minors, or any liens or other securities on property, real or personal," are equally entitled to the protection claimed under the proviso of the second section of the bankrupt act. How would it be possible to make any rational sale of the estate of the bankrupt, subject to these unascertained encumbrances ? Neither the seller could possibly know the actual value of what he was selling, nor the purchaser what he was buying. Both would be acting perfectly in the dark. Between the two modes of selling the encumbered property, — that of selling it although shingled over with unknown liens, or liens of unascertained amount or validity, subject to the whole of them, or that of fairly selling it upon ample notice, liberated from all encumbrances, good and bad, and applying the proceeds first to the satisfaction of all "lawful rights of married women or minors, or any liens, mortgages, or other securities," and the surplus, if any, to other creditors, — there cannot for a moment be a doubt which is fraught with the most equity, justice, and propriety. The error of the argument of the defendant, in opposition to the latter mode of sale, consists in considering it as annulling, destroying, or impairing the lien. So far from its having that effect, the precise object for which it was created is accomplished by applying the proceeds of the mortgaged property to the satisfaction of the lien. It no more annuls, destroys, or impairs the lien, than would be done by a

judicial sale of the property under a judgment or the decree of a State tribunal. A mortgage cannot be justly or truly said to be impaired or annulled when it has been fully satisfied, or satisfied to the extent of all the proceeds of the property mortgaged.

If it had been the intention of Congress to do any thing more, in regard to mortgages and other liens, than to preserve them unimpaired, — if it had been intended to exclude them altogether from the operation of the bankrupt act, — different language from that which was actually used would have been employed. Thus in the third, the next section of the act to that which has been under consideration, the language of the proviso is, "that there shall be excepted from the operation of the provisions of this section the necessary household and kitchen furniture," &c., clearly manifesting, that, with that exception, it was the purpose of Congress to vest in the assignee the whole estate of the bankrupt, of every name and nature, encumbered or unencumbered, to be administered by him with due regard to the rights and privileges of all persons.

But it is useless to prolong the argument in support of the interpretation of the bankrupt law now contended for. Any necessity for it is wholly superseded by authoritative decisions of the highest tribunals, federal and State. The jurisdiction of the United States District Court, sitting in bankruptcy, over the property mortgaged by the bankrupt, is supported and maintained by this court in the case Ex parte the City Bank of New Orleans (the same bank which is defendant in this case) against Christy, Assignee, 3 Howard's Reports, 292. Nothing can be more full, clear, and satisfactory, than the reasoning employed by this court in that case, and the conclusions at which it arrives. It was objected against it, in the court below, that the decision was extra-judicial; that it was not necessary to determine the point as to the jurisdiction over mortgages; and that the cause went off by a refusal to grant the prohibition moved for. It is true, that, if the Supreme Court had chosen to shrink from any expression upon that point of its opinion, and to stand non-committal, it might have limited itself to a simple denial of the prohibition. But it is respectfully conceived, that such a course of darkness would not have well corresponded with the duty and dignity of that high tribunal. The point fairly arose in the cause, was elaborately discussed in the argument, and was deliberately considered by the court. It arose under a new law, just going into full operation throughout the whole extent of the United States, and subject to exposition by a great variety of tribunals, federal and State. Conflicting, or apparently conflicting, decisions were made, or in danger of

being made, by inferior courts. All eyes were anxiously turned to this court for light. The very party now objecting to the authority of the precedent brought the point before the court, and fully, ably, and confidently argued it. Under all these circumstances, and considering the great necessity for uniformity of practice and decision under this new law, could this court have justly and honorably avoided settling definitively the controverted point ? The court thought it could not. The decision of such a question, which was attended with so much solemnity and consideration, cannot be regarded as *obiter dicta*, or loose expressions of judges, which accidentally fall from them, without deliberation, during the progress of a trial.

But, to put the matter for ever at rest, this court subsequently reaffirmed all the doctrines and principles laid down previously in the preceding case; in Norton's Assignee v. Boyd and others, 3 Howard, 434.

I will not go into an examination of the decisions of particular judges of the federal courts, acting on the circuits or in the districts; for if they conflict with those already referred to, they must yield to the paramount authority of this court.

If this decision of the question, by the highest tribunal in the land, stood upon its own exalted authority and dignity alone, it ought to command the respect and obedience of all other tribunals, State and federal, within the United States. For if the Supreme Court of the United States cannot finally and definitively settle a controverted interpretation of a law of the United States, our admirable but complicated system of free government would be thrown, as to the administration of justice, into utter and hopeless disorder and confusion. But it does not rest upon the sole authority of this court. The Supreme Court of Louisiana, by repeated decisions, fully and deliberately considered, had decided the same question in the same way. Conrad, Assignee, &c., v. Prieur, Recorder, &c., 5 Robinson, 49; Clarke, Assignee, v. Rosenda et al., 5 Robinson, 27; Benjamin, Assignee, v. Prieur, 5 Robinson, 59; Lewis v. Fisk et al., 6 Robinson, 159.

It will be perceived, on an examination of these cases, that they cover the whole ground of the question of the jurisdiction of the bankrupt court; and that it was thoroughly considered and most ably argued. The Supreme Court of Louisiana declares, that, however the question may be settled in other States, the maintenance of the jurisdiction of the bankrupt court is essential to the purposes of justice in Louisiana ; and that, if it be not maintained, "it would be destructive of most of the liens and securities intended to be protected by the last proviso of the second section of the act of Congress," owing.

to the peculiar nature of the liens and mortgages as constituted by the laws of Louisiana.

Thus doubly fortified by the solemn and deliberate decisions of the highest judicial tribunal in the United States, and the highest judicial tribunal of the State of Louisiana, the plaintiffs had some right to suppose that they could not be disturbed in the possession of property fairly purchased, and held by them under the sanction of these high authorities.

(*Mr. Clay* then replied to *Mr. Sergeant's* argument respecting the irregularity of the proceedings.)

III. That the cancelment and erasure of the defendant's mortgage create an absolute bar to any relief which he now seeks to subject the mortgage in the hands of third parties to his demand.

IV. That the defendant, by his culpable silence and non-intervention, during the whole proceedings, from beginning to end, and terminating in the consummation of the sale of the mortgaged property by the passing of titles, has deprived himself of all right to the aid and assistance of a court of justice to enforce his present claim.

(As the decision of the court did not turn upon either of these points, the argument is omitted.)

Mr. Chief Justice TANEY delivered the opinion of the court.

This case is brought here by a writ of error directed to the Supreme Court of the State of Louisiana, under the twenty-fifth section of the act of 1789. The record is voluminous, and necessarily so from the nature of the controversy in the State courts. But the following summary statement contains all the facts material to the question now before this court upon the writ of error.

In 1842, Thomas Banks, a citizen of New Orleans, was declared a bankrupt under the act of Congress to establish a uniform system of bankruptcy, and F. B. Conrad appointed his assignee. At the time of his bankruptcy he was the owner of certain real property in New Orleans, called Banks's Arcade, upon which he had executed three several mortgages, all of them outstanding and unsatisfied at the time he became a bankrupt. The first was to the New Orleans Canal and Banking Company; the second to the Carrollton Railroad Company; and the third to the City Bank of New Orleans.

Upon the application of the assignee, the District Court of the United States ordered those mortgaged premises to be sold, and directed that the mortgages should be cancelled, and the property sold free from encumbrance, rendering to the parties interested their respective priorities in the proceeds. It

was accordingly sold, and purchased by the appellants; and they having complied with the terms of sale, conveyances have been made to them by the assignee, and possession delivered.

Before the money was paid by the purchasers, there were some proceedings in the State courts in order to obtain the actual cancellation of these mortgages in the office in which they were recorded. But these proceedings are not material to the question before this court, and it is unnecessary to state them.

After the sale was made and reported by the assignee, the New Orleans Canal and Banking Company, which held the elder mortgage, filed a petition in the District Court, praying that the proceeds of the sale might be paid over to that bank; the whole amount for which the property was sold being insufficient to satisfy the debt due on that mortgage. The said bank had, it appears, before this application was made, consented to the sale by the assignee, and agreed that the mortgages in its favor should be cancelled, for the purpose of giving titles to the purchasers, reserving its rights to be paid first out of the proceeds.

But neither the Carrollton Railroad Company nor the City Bank of New Orleans appeared in the District Court in any of the proceedings hereinbefore mentioned, although regularly notified. Nor did either of them exhibit or prove any claim against the bankrupt's estate, nor assent or object to the sale, or to any of the proceedings therein.

Subsequently, however, and after the proceedings upon this subject in the District Court had been completed, and the purchasers had complied with the terms of sale, and received their titles from the assignee, and been placed in possession of the premises, the City Bank of New Orleans, which held the third mortgage, instituted a suit in the Commercial Court of the State, for the purpose of charging the property in the hands of the purchasers with the money due on its mortgage. The purchasers resisted the claim, upon the ground that they were entitled to hold the property free and discharged from this encumbrance, under the sale made to them by the assignee, as hereinbefore stated. And the Commercial Court having decided in favor of the validity of this defence, the bank appealed to the Supreme Court of the State, where the question was raised and argued, whether, under the act of Congress establishing a uniform system of bankruptcy, the purchasers were entitled to hold the premises free and discharged from the mortgage to the City Bank.

Upon this question the Supreme Court reversed the judg-

ment of the Commercial Court, and adjudged that the property should be seized by the sheriff, and sold to satisfy the demand of the bank. And it is this judgment of the Supreme Court of Louisiana that is now before this court for revision.

The record manifestly presents a case within the twenty-fifth section of the act of Congress of 1789, and the jurisdiction of this court has not been disputed. The authority of the District Court of the United States to order the sale of the property free from and discharged of the encumbrances, as mentioned in the proceedings, was drawn in question, and the decision of the Supreme Court of the State was against the validity of the authority thus exercised by the District Court. And this is the only question upon which this court is authorized to pass judgment; for the same section of the act of 1789, which gives jurisdiction in the cases therein enumerated, forbids it to be exercised over any other question which may have arisen in the case, or been decided by the State court.

The question, then, to be decided by this court is simply this: — Are the purchasers under the sale made by the assignee of Thomas Banks, as hereinbefore stated, under the authority of the District Court, entitled to hold the property free and discharged from the mortgage and encumbrance of the City Bank?

With every respect for the learned State court which has decided against the right of the purchasers, we cannot persuade ourselves that it can be either necessary or proper, at this day, for this court, in deciding a case like this, to enter into an argument upon the construction of the bankrupt law, in order to vindicate its judgment. The power of the District Court over mortgages, in cases of bankruptcy, was fully argued and considered in the two cases reported in 3 Howard, 292, and 426, as appears by the opinions delivered by the court, and the opinions of the justices who dissented. But whatever difference of opinion existed as to some of the propositions maintained in these cases by the majority of the court, there has been no division of opinion upon a question like the one presented in this record. And the court are unanimously of opinion, that the sale made by the assignee of the property in question is valid, and that the purchasers are entitled to hold it free and discharged from the mortgage to the City Bank, and from all other encumbrances mentioned in the proceedings.

The judgment of the Supreme Court of Louisiana must therefore be reversed.

### Order.

This cause came on to be heard on the transcript of the

record from the Supreme Court of the State of Louisiana, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Supreme Court in this cause be and the same is hereby reversed, with costs, and that this cause be and the same is hereby remanded to the said Supreme Court, to be proceeded with in conformity to the opinion of this court, and as to law and justice shall appertain.