SOUTHERN LOAN & TRUST CO. v. BENBOW et al.

(District Court, W. D. North Carolina.    September 5, 1899.)

1. BANKRUPTCY—COLLECTION OF ASSETS—PROPERTY IN POSSESSION OF STATE COURT.
    Where property of an estate in bankruptcy is in the actual custody and control of a state court of competent jurisdiction, through its officers, its possession of the property will not be interfered with, nor its disposition of the same restrained, by process from a court of bankruptcy.

2. SAME—ENJOINING SALE UNDER DECREE PROCURED BY FRAUD.
    Certain judgment creditors brought an action in a state court against their debtor and against an assignee to whom he had made a deed of assignment with preferences, and procured a decree adjudging the assignment to be null and void, as being intended to defraud creditors, establishing the liens of the plaintiffs on the property affected as prior to all others, and ordering the property to be sold.    This decree was made by consent, without any opposition or contest on the part of the debtor or the assignee, and the court was not informed of the fact that the debtor had already been adjudged bankrupt and a trustee of his estate appointed, nor of the fact that all the judgments had been bought by a son of the bankrupt (and it was alleged with funds furnished by the latter) and he was the only real plaintiff.    Held, that the court of bankruptcy, on petition of the trustee, would enjoin the state court's officer, the bankrupt, and all others concerned from selling the property under the decree, and instead would order it sold by the trustee free of incumbrances.

3. SAME.
    The jurisdiction of the court of bankruptcy, in such a case, to issue its injunction as prayed, is not affected by the fact that the bankrupt has already received his discharge.

4. SAME—RECEIVER OF STATE COURT—SUPERIOR TITLE OF TRUSTEE.
    A receiver appointed by a state court in proceedings supplementary to execution, and empowered to sue for and collect the property of the debtor previously passed to a third person by a fraudulent assignment, but who has not reduced the same to his possession nor taken any steps to do so, is not vested with such a title or right of possession of the property as will prevent a court of bankruptcy, on the adjudication of the debtor, from taking possession of it through the trustee.

5. SAME—SALE OF BANKRUPT'S PROPERTY FREE OF LIENS.
    A court of bankruptcy may, in its discretion, order the trustee to sell property of the estate free from liens and incumbrances, preserving and transferring bona fide and valid liens on the property to the proceeds of the sale.

6. SAME—CONSTRUCTION OF STATUTE.
    The bankruptcy act is a remedial statute, and should be interpreted reasonably and according to the fair import of its terms, with a view to effect its objects and promote justice.

In Bankruptcy.     On petition for restraining order.

This is a petition on the part of the Southern Loan & Trust Company for an order restraining and enjoining C. P. Frazier, a commissioner appointed by the superior court of Guilford county, N. C., from selling certain described property of D. W. C. Benbow, who had filed a petition in bankruptcy, and had been duly adjudged a bankrupt on the 5th day of April, 1899, Charles D. Benbow, assignee of the said D. W. C. Benbow, and all agents and attorneys of any of the said parties, from making sale of the said property, or in any way interfering with, or disposing of, the estate of the said bankrupt. It appears from the record in the case, the affidavits filed, and the testimony of the bankrupt, D. W. C. Benbow, taken before the referee in bankruptcy on the 19th day of August, 1899, that the bankrupt, D. W. C. Benbow, was an indorser on the notes of the North State Improvement Company, an insolvent corporation in this state, to the extent of $367,000. On the 23d day of January, 1894, he executed to one J. S. Cox, of High Point, N. C., a deed of assignment to secure certain alleged creditors to the amount of $37,383.33, naming especially in the said deed, as preferred creditors, his wife, Mrs. Mary E. Benbow, his son, Charles D. Benbow, and his wards, Oliver C. and William C. Benbow. Immediately following this assignment, and between February 1, 1894, and May 11, 1896, 24 separate judgments, aggregating upwards of $400,-000, were docketed against the said D. W. C. Benbow in the superior court of Guilford county. In proceedings supplementary to execution instituted by the National Bank of Greensboro, one of the judgment creditors, on the 12th day of April, 1894, against J. S. Cox, trustee, D. W. C. Benbow, Mary E. Benbow, and Charles D. Benbow, before the clerk of the superior court of Guilford county, one W. H. Reagan, a director in the National Bank of Greensboro, was appointed receiver of all the property, real and personal, including the choses in action, of the said D. W. C. Benbow, upon his executing bond in the penalty of $1,000. This order was made on the 2d day of May, 1894. The trust was accepted, and the bond filed by the said Reagan. The order appointing Reagan vested the receiver with all the powers of receivers in cases supplementary to execution, and empowered him to bring suits in his own name as such receiver, or in the names of the plaintiffs, for the recovery of the property of the defendant, real and personal. The order further forbade D. W. C. Benbow and his wife, Mary E. Benbow, from interfering with, or in any way disposing of, any of the property of the judgment debtor, D. W. C. Benbow, not exempt from execution, and especially enjoined them from collecting or interfering with the collection of a certain note due by one B. J. Fisher to D. W. C. Benbow, for the sum of $17,235, and certain other notes executed by one Ross to the said D. W. C. Benbow, for the sum of $4,500. It further appears that Reagan was a personal friend of D. W. C. Benbow, and that he was appointed receiver at the suggestion of the said D. W. C. Benbow. Upon his appointment as receiver, and as such receiver, he instituted, on the 15th day of May, 1894, in the superior court of Guilford county, a suit against J. S. Cox, trustee, Mary E. Benbow and D. W. C. Benbow, her husband, and B. J. Fisher, for the recovery and payment directly to him, the said receiver, of the sum of $17,235, the amount due by the said B. J. Fisher to the said D. W. C. Benbow. This action by Reagan, receiver, was pending in the superior court, May term, 1899, when the judgment of the plaintiff, the National Bank of Greensboro, having been sold and assigned to Charles D. Benbow, the son of D. W. C. Benbow, and who, with his father, was a defendant in the action (all issues having been found by the jury in behalf of the defendant Charles D. Benbow), a decree of the said court was entered declaring the said Charles D. Benbow, the son of the bankrupt, the owner of the said Ross notes, and declaring the said Charles D. Benbow, as executor of the estate of his mother, Mary E. Benbow, the owner of the Fisher note, and by said decree costs of said action were taxed against the receiver, and in favor of said defendants. It further appears that, in the year 1894 and subsequent thereto, the National Bank of Greensboro and Roe Wiggins, the Atlantic Bank of Wilmington, the Wilmington Savings & Trust Company, the People's National Bank of Lynchburg, the National Bank of Greensboro and I. Davenport, Jr., and the First National

Bank of Richmond, Va., and the Union Bank of Richmond, Va., brought five separate actions in the nature of creditors' bills, in the order named, and at different times, in the superior court of Guilford county, against D. W. C. Benbow and others, for the purpose of setting aside, and having declared void, the deed of assignment made by the said D. W. C. Benbow to said J. S. Cox, assignee, on the 23d day of January, 1894, as being made for the purpose of hindering, delaying, and defrauding certain of the bankrupt's creditors, and for the purpose of giving fraudulent preferences to others. These actions remained on the calendar of the superior court of Guilford county for the five years following, and up to the June term, 1899, of the said superior court. At that term the said cases were consolidated, and a decree entered by consent of all parties interested. After a statement of facts, the decree recites: "That the object and purpose, among other things, in each and all of said actions, was to have declared void a deed of assignment made by the defendant D. W. C. Benbow to J. S. Cox, assignee, on the 23d day of January, 1894, and to assert, by reason of the character of said actions, liens on the property mentioned in said deed of assignment, in priority over all other creditors, not suing before the filing of the complaint in each of the above-styled several and respective actions, and the plaintiffs in the said several actions now claiming priority over every other creditor not suing before his or its suit was brought, and asks that a lien be declared upon the property described in the said deed of assignment in priority, as hereinbefore stated. Now, on motion of G. S. Bradshaw, counsel for the plaintiffs, it is held, adjudged, and declared by the court that the said deed of assignment, by the said D. W. C. Benbow to J. S. Cox, assignee, is null and void, and was made by the said D. W. C. Benbow to hinder, delay, and defraud his creditors, and the same is hereby in all respects set aside. It is further adjudged by the court that the plaintiffs in these several suits, by the reason of the bringing of their said actions, and the nature of the same, have priority of lien on the property described in the said deed of assignment over all other creditors, and the priorities of these said several plaintiffs, as among themselves, is waived. And it is now, by consent of parties plaintiff and their assignees, ordered and adjudged that the proceeds received from the sale of the property in said assignment mentioned, and hereinafter ordered to be sold, shall be distributed ratably, without priority one over the other, but among the plaintiffs in the hereinbefore first above styled cases and their assignees. It is further ordered and adjudged by the court that, to satisfy, pay off, and discharge the said several judgments referred to in the pleadings, * * * it will be necessary to sell the property described in the said deed of assignment, and for that purpose C. P. Frazier is hereby appointed a commissioner, with power and duty to advertise the said property * * * for cash, which is hereby fixed as the terms of sale, except as hereafter set out; that is to say, any and all persons, other than the plaintiffs in the above-entitled actions, or the assignees of the said plaintiffs, who shall become a purchaser of any of the above-mentioned property, under the sale by the aforementioned commissioner, shall pay cash as above described, but in the event that either of the above plaintiffs, if such plaintiff has not assigned his judgment, or their assignees, shall become a purchaser of any of said property, then, in such case, such purchaser shall be required to pay to the said commissioner only $—— on his bid, which is intended to cover costs, and as to the balance he shall either give credit on his said claim, or pay in whole his bid, or such part thereof as the court may hereafter order, to meet and settle the priorities as hereinbefore established and fixed."

At the time of the rendition of this decree in the superior court of Guilford county, it appears that none of the plaintiff judgment creditors had any interest whatsoever in the judgments sued on, but that they had been purchased, and were absolutely owned and controlled, by Charles D. Benbow, and, as the petitioner in this case alleges, purchased with funds belonging to D. W. C. Benbow, and advanced by him to Charles D. Benbow, his son, for the express purpose of purchasing said judgments. It does not appear that Benbow, bankrupt, made any effort to sustain the deed of trust made by him to J. S. Cox, assignee, on the 23d day of January, 1894, or that he took any exceptions to the entry of the consent decree at the June term, 1899, of the

superior court of Guilford county, declaring his deed to Cox as fraudulent and void as to creditors, or that Cox, the trustee, excepted to the said decree or appealed therefrom. On the contrary, Mr. Bradshaw appeared in the suit at the June term, 1899, of the superior court of Guilford county, when the consent decree was entered, as the attorney of Charles D. Benbow, at the suggestion of D. W. C. Benbow, his father, and both Messrs. Morehead and Bynum & Bynum, the attorneys of D. W. C. Benbow, and J. S. Cox, assignee, were present when the said decree was signed, and assented to the signing of the said decree, declaring the deed of assignment made by Benbow, on the 23d day of January, 1894, to Cox, trustee, null and void, as being made in fraud of the creditors of the said D. W. C. Benbow. Nor does it appear that any suggestion of the bankruptcy of Benbow (who had filed his petition in bankruptcy, and had been adjudicated a bankrupt, on the 25th day of April, 1899) was made to the superior court at the time this decree was entered. Nor does it appear that Reagan, receiver, appointed May 2, 1894, by the clerk of the superior court of the county of Guilford, manifested any interest in the matter when the consent decree was made, or that he then set up, or attempted to set up, any claim or right that he had to the possession of the property of the said Benbow, by reason of his office as receiver. On the contrary, it appears from the evidence of Benbow himself that Reagan was, prior to June term, 1899, active in his efforts to secure, by purchase, certain of these judgment liens for the said Benbow, and for the five years following his appointment he had taken no steps whatever to recover any of the property, or any of the choses in action, of the said D. W. C. Benbow, saving and excepting the Fisher and Ross notes, where there was a judgment adverse to him in the superior court of Guilford county, as appears from the record in the case. It further appears that it was through the instrumentality of Reagan that the Fisher and Ross notes were hypothecated to the National Bank of Greensboro, of which bank Reagan was a director, for large sums of money, which sums were placed in the bank to the individual credit of the said D. W. C. Benbow, bankrupt, and by him used in the purchase of the above-named judgments, as alleged by the petitioner in this proceeding. It further appears that the consent decree appointed one C. P. Frazier commissioner to sell the said property of the said Benbow, and that this appointment of Frazier was not only made at the suggestion of Benbow, bankrupt, but that he (Benbow) had an agreement with the said Frazier whereby he was to be entitled to all the commissions allowed by the court to the said Frazier for conducting the sale of the said property. It further appears that the property described in the deed of assignment made by Benbow to Cox, assignee, on the 23d day of January, 1894, and declared null and void as to creditors in June, 1899, was fully set out by the bankrupt, D. W. C. Benbow, in his petition and schedules marked "B," with the following memoranda attached, to wit: "The exhibit hereto attached, marked 'A,' contains description of property conveyed to J. S. Cox, trustee, Greensboro, N. C., by deed dated January 23, 1894." "None of said property has been disposed of by the trustee owing to the fact that certain creditors have attacked said assignment, and the litigation still continues." It further appears that Cox, trustee, as aforesaid, has continuously collected the rents and profits from the estate of D. W. C. Benbow, bankrupt, from the date of the assignment to Cox, January 23, 1894, to June term, 1899, of the superior court of Guilford county, at which time the said deed was declared null and void. It is conceded by the bankrupt that he inadvertently omitted to schedule three small tracts of land that were of little value, and that these tracts were not included in his deed of assignment to Cox, but have been advertised for sale by Frazier, the commissioner appointed by the superior court of Guilford county. The petitioner in this case is the trustee of the bankrupt, duly appointed by the referee in bankruptcy, and it has accepted the trust and filed its bond as such trustee.

Upon the above statement of facts, it is insisted by the petitioner in this cause that as the deed of assignment executed by D. W. C. Benbow to J. S. Cox, trustee, on the 23d day of January, 1894, was declared to be null and void as to creditors by the superior court of Guilford county, June term, 1899, the legal title to all property of the said D. W. C. Benbow, described in

said deed of assignment, as well as all other property scheduled by the bankrupt in his petition and schedules filed April 5, 1899, or in which he had title, and had failed to schedule, either by design or inadvertence, vested in him, the said trustee, as of the date when the said Benbow was adjudged a bankrupt; that the consent decree made at the June term, 1899, of the superior court of Guilford county, was procured by collusion and connivance of the said Benbow, who obtained the said decree by practicing a fraud upon the superior court, withholding, as he did, from the said court, the facts that he, the said Benbow, had been adjudicated a bankrupt on the 5th day of April, 1899, and that the said D. W. C. Benbow had actually purchased, and was the actual and absolute owner of, the said judgments described in the pleadings in the suits instituted by the five creditors, and were special liens over other creditors not suing; that, although the said D. W. C. Benbow is the actual owner of the said judgments, they are claimed to be the property of the son of the bankrupt, Charles D. Benbow, who, acting for the bankrupt, will, at the sale, as a judgment creditor having priority in the distribution of the proceeds of the sale, and the privilege of bidding to the amount of his judgments without paying any cash, purchase the said property at a price far below its actual value, thereby defeating the claims of other creditors holding large claims against the bankrupt's estate. Upon the part of the respondent D. W. C. Benbow, it is insisted that the liens of the judgment creditors above named, who filed creditors' bills in 1894 and 1895, were executed years before the enactment of the bankruptcy act of 1898, and that, therefore, this court cannot interfere by injunction; that the proceeds realized from the sale of the property of the bankrupt will not be more than sufficient to pay off and discharge the liens of complainants in said creditors' bills; that the superior court of Guilford county is in possession of the said property; that the bankruptcy of Benbow cannot devest the jurisdiction of said court, it having concurrent jurisdiction with that of courts in bankruptcy; that the decree obtained in the superior court of Guilford county in June, 1899, was not procured by any connivance or preconcerted arrangement with the respondent D. W. C. Benbow; that Charles D. Benbow had not purchased any of the judgments referred to, for him or his benefit, and that he has no personal interest in the sale of the property advertised to be sold by Frazier, commissioner. The respondent Charles D. Benbow, in answering the rule served upon him, avers that he does not hold the assignment of the judgments above described as agent or trustee for his father, D. W. C. Benbow, but that he is the actual and bona fide holder of the same; that the decree obtained in the superior court of Guilford county was not secured by connivance or collusion on his part with D. W. C. Benbow, bankrupt, or any other party, nor is it his purpose to bid in the property at the said sale for the benefit of his father, D. W. C. Benbow. The commissioner, C. P. Frazier, avers, in answer to the rule, that it is his purpose to sell the property described in the decree of the said court in such manner and in such lots as, in his opinion, will be most conducive to obtain the highest prices for the same. It is further insisted by respondents that, as this bankrupt was discharged on the 31st day of May, 1899, no injunction or restraining order can be issued in the cause. It is further insisted by respondents that Reagan, the receiver appointed May 2, 1894, by the clerk of the superior court of Guilford county, holds all the property of the said Benbow under and by virtue of an order of the superior court of Guilford county.

J. T. Morehead and R. R. King, for bankrupt.

John S. Hill and E. K. Bryan, for trustee in bankruptcy and certain creditors.

J. C. Pritchard, John N. Wilson, and Levi M. Scott, for Murchinson & Co., judgment creditors.

EWART, District Judge (after stating the facts as above). An interesting question always arises with respect to how far the jurisdiction of a court of bankruptcy extends to obtain possession of the assets of a bankrupt. In cases of property voluntarily surrendered to

the trustee, there can be no controversy; but where the property is in the actual possession of another court, or an officer thereof, the remedy is not so plain. The rule which has been regarded by the federal courts generally is that, where property is in the actual possession of one court of competent jurisdiction, such possession cannot be disturbed by process issued from another court. Shields v. Coleman, 157 U. S. 168, 15 Sup. Ct. 570; Moran v. Sturges, 154 U. S. 274, 14 Sup. Ct. 1019; The Lotta, 65 Fed. 319.

In Compton v. Jesup, 15 C. C. A. 397, 412, 68 Fed. 263, 279, Judge Taft said:

"Necessity and comity both require that where, by its officers acting under color of its orders and processes, a court has taken into its custody property of any kind, another court, though of equal and co-ordinate jurisdiction, should not be permitted either to oust the possession of the first court, or in any way to interfere with its complete control and disposition of the property for the purpose of the cause in which its action has been invoked. This principle has been laid down by the supreme court of the United States in a long line of cases. Hagan v. Lucas, 10 Pet. 400; Williams v. Benedict, 8 How. 107; Freeman v. Howe, 24 How. 450; Bank v. Calhoun, 102 U. S. 256; Gumbel v. Pitkin, 124 U. S. 131. 8 Sup. Ct. 379; In re Tyler, 149 U. S. 181, 13 Sup. Ct. 793; Byers v. McAuley, 149 U. S. 608, 13 Sup. Ct. 906. In Riggs v. Johnson Co., 6 Wall. 196, the court, speaking of the state and federal courts, said: 'The process issued by one court is as far beyond the reach of the other as if the line of division between them was traced by landmarks and monuments visible to the eye.'"

In a more recent case (In re Abraham, 93 Fed. 774), Judge McCormick, of the circuit court of appeals, Fifth circuit, in a most learned and elaborate opinion, says:

"Immediately upon the taking effect of the bankruptcy act of 1867, the dockets of the courts of bankruptcy became crowded. The most able and careful judges of the district court, pressed by urgent conditions and argument, with little call or time to doubt, began to extend summary process and proceedings so as to meet all individual cases presented. The growing weight of precedent thus nourished by their own practicably unreviewable, or actually unreviewed, decisions, carried their jurisdiction to that point where, a few years later, it became burdensome and dangerous to all persons engaged in agriculture, manufacturing, or commercial purposes, and dealing to any considerable extent on credit. However, after the lapse of some years, cases began to reach the dockets of the supreme court; and, after the substantial final settlement by the subordinate courts of the great bulk of business that arose under the act, the supreme court began to reach the cases on its dockets which involved the construction of the act, and announce decisions marking the boundaries of the jurisdiction it conferred, and the manner of procedure in its exercise. These decisions settled that most matters and proceedings in bankruptcy were to be heard and adjudicated in a summary way, but that the general jurisdiction thus to proceed did not extend to controversies by an assignee in bankruptcy against any person claiming an adverse interest, or by such person against such assignee, touching any property or rights of property of the bankrupt transferred to, or vested in, the assignee; that such controversies, where they could not be settled otherwise than by legal proceedings, could be prosecuted only by plenary suits at law or in equity."

In Eyster v. Gaff, 91 U. S. 521, it was held that the jurisdiction conferred upon the federal courts for the benefit of an assignee in bankruptcy was concurrent with and does not devest that of the state courts in suits in which they had full cognizance. As highly instruct-

ive and pertinent to our own inquiry, we quote some of the language of the opinion in the case last cited:

"The opinion seems to have been quite prevalent in many quarters at one time, the moment a man is declared a bankrupt the district court, which has adjudged, draws to itself, by that act, not only all control of the bankrupt's property and credits, but that no one can litigate with the assignee or contest rights in another court, except in so far as the circuit court took concurrent jurisdiction, and all other courts can proceed no further in suits of which they had, at that time, full cognizance, and it was a prevalent practice to bring any person who contracted with the assignee any matter growing out of disputed rights of property or of contracts into the bankrupt courts by the service of a rule to show cause, and to dispose of their rights in a summary way. This court has steadily set its face against this view. The debtor of a bankrupt, or the man·who contests the right to real and personal property with him, loses none of these rights by the bankruptcy of his adversary. The same courts remain open to him in such contests, and the statute has not devested those courts of jurisdiction in such actions. If it has, for certain classes of actions, concurrent jurisdiction for the benefit of the assignee in the circuit and district courts of the United States, it is concurrent with and does not devest that of the state courts."

In the case just cited (In re Abraham), Abraham, the bankrupt, had executed, under the laws of Alabama, a deed of assignment to one Davidson, covering a certain stock of goods. Davidson immediately took possession of the said stock, and filed his inventory of the same in the proper state court. Appraisers were duly appointed, and filed their report in the said state court; whereupon Davidson, as assignee, sold the goods, for cash, to one Bernheimer, who immediately went into possession of the same, and was disposing of the said stock from day to day, when, under a special warrant issued out of the court of bankruptcy, the marshal seized the remainder of the said stock. Pending the action of the assignee in disposing of this stock, proceedings in involuntary bankruptcy were filed against Abraham by certain creditors, and he was duly adjudged a bankrupt. The circuit court of appeals, Fifth circuit (Judge Parlange dissenting as to the intimation in the opinion of the court that the court of bankruptcy could not have taken possession of the bankrupt's estate prior to the sale and while it was in the hands of the assignee), held that the application and issuance of the writ, directing the marshal to seize the whole of the stock of goods in the possession of Bernheimer, was totally un; warranted and unlawful, and that the possession thereof must be restored to the adverse claimant. The court, referring to the proceedings, said:

"It is our duty to prevent the springing up of a practice that will extend summary process in proceedings in bankruptcy to controversies between trustees or other parties to the bankruptcy proceedings and adverse claimants. Under the act of 1867, such a practice was prevalent in many quarters at certain times, but it rested on opinions taking a view of the provisions of the act, against which, as we have seen, the supreme court steadily set its face. As we construe the provisions of the present law, they not only do not admit of such a view or authorize such a practice, but carefully guard against it and forbid it."

In Ex parte Chetwood, 165 U. S. 443, 17 Sup. Ct. 385, it is said:

"Where the jurisdiction of a court, and the right of a plaintiff to prosecute his suit in it, have once attached, that right cannot be arrested or taken away by proceedings in another court. Where property is in the possession of a

court of competent jurisdiction, that possession cannot be disturbed by process out of another court of concurrent jurisdiction."

See, also, Kimberling v. Hartly, 1 Fed. 571; Carr v. Fearington, 63 N. C. 560; Erwin v. Lowry, 7 How. 172; Miller v. Sherry, 2 Wall. 237; In re Easley, 93 Fed. 419; Sedgwick v. Menck, 1 N. B. R. 675, Fed. Cas. No. 12,616; Beach, Rec. 38.

It will be observed that in Eyster v. Gaff, and in all other cases above cited, the property of the bankrupt was in the actual possession of the state courts or adverse claimants. Where the property in question is not covered by litigation, or is not in the possession of the state courts, the jurisdiction of the bankruptcy courts will not be ousted. It is the interference with the possession of another court, that would ensue if jurisdiction was taken, and the existence of a receivership, if a receiver has taken the property in controversy into his own possession. Andrews v. Smith, 5 Fed. 833; 20 Am. & Eng. Enc. Law, p. 67; Eyster v. Gaff, 91 U. S. 521.

A careful comparison of the provisions of the bankruptcy acts of 1841 and 1867 with similar provisions of the act of 1898 shows that the power and jurisdiction of the United States district court under the act of 1898 is as complete and extensive as under the acts of 1841 and 1867.

In the absence of any decisions of the United States supreme court construing the act of 1898, it may be of interest to note the leading case upon the powers and jurisdiction of the district courts under the act of 1841. The case referred to is In re Christy, 3 How. 292. Chief Justice Story, in delivering the opinion of the court, says:

"We entertain no doubt that, under the provisions of the sixth section of the provisions of the act of 1841, the district court possesses full jurisdiction to suspend or control such proceedings [proceedings to enforce liens] in the state courts, not by acting on the courts, over which it possesses no authority, but by acting on the parties through the instrumentality of an injunction or other remedial proceedings in equity, upon due application made by the assignee, and a proper case being laid before the court requiring such interference. * * * But because the district court does possess such a jurisdiction under the act there is nothing in the act which requires that it should, in all cases, be absolutely exercised. On the contrary, where suits are pending in the state courts, and there is nothing in them which requires the equitable interference of the district court to prevent any mischief or wrong to other creditors under the bankruptcy, or any waste or misapplication of the assets, the parties may still be permitted to proceed in such suits, and consummate them by proper decree and judgments, especially where there is no suggestion of any fraud or injustice on the part of the plaintiffs in those suits."

Continuing (page 319), Justice Story says:

"It would be easier to put cases in which the exercise of this authority may be indispensable on the part of the district court to prevent irreparable injury or loss or waste of the assets without adverting to the case at bar, where, upon the allegation in the petition and supplemental petition, the creditors of the bankrupt are attempting to enforce a mortgage asserted to be illegal and invalid, and to procure a forced sale of the property by the sheriff in an illegal and irregular manner, thereby sacrificing the interests of the other creditors under the bankruptcy."

Justice Story further says:

"If we are told that resort may be had to the state courts for redress, one answer is that in some of the states no adequate jurisdiction exists in the

state courts, since they are not clothed with general jurisdiction in equity; but a stronger and more conclusive answer. is that congress did not intend to trust the working of the bankrupt system solely to the state courts of twenty-six states, which were independent of any control by the general government, and were under no obligations to carry the system into effect. The judicial power of the United States is, by the constitution, competent to all such purposes, and congress, by the act, intended to secure the complete administration of the whole system in its own courts, as it constitutionally might do." "The truth is [says Justice Story on page 321] that in no other way could the bankrupt system be put into operation without interminable doubts, controversies, embarrassments, and difficulties, or in such a manner as to achieve the true end and design thereof. Its success was dependent upon the national machinery being made adequate to all the exigencies of the act."

The principles established in this case were reviewed at length in Nugent v. Boyd, 3 How. 426, and confirmed. In delivering the opinion, Chief Justice Taney says:

"Where a creditor, by virtue of a special mortgage, elects to foreclose that mortgage before a state tribunal, the federal court is not called upon to interpose, except in cases where, from the nature of the case, wrong or injustice may be done to other creditors in interest, or where the mortgage itself may be contested. I wish it, however, to be distinctly understood that I am fully of the opinion that the district court of the United States is vested with jurisdiction over mortgaged property belonging to the bankrupt; that, when a proper cause is shown, it has power to foreclose the mortgage, and to do all other acts necessary to bring about a final distribution and settlement of the bankrupt estate. I am also of the opinion that, in a case where a creditor calls in question the validity of a mortgage held by another creditor, it is the duty of the said court (the district court) to exercise jurisdiction over the question involved, and, if necessary, to declare the mortgage null and void."

Collier on Bankruptcy (pages 12–17) says:

"The opinion in Re Christy is reviewed and followed by Baker, District Judge, in the case of Carter v. Hobbs, 92 Fed. 594, a case arising under the existing act. The bankruptcy court has complete original jurisdiction over the bankrupt, or of his assets and all of his creditors. In Re Winn, 30 Fed. Cas. 303, the object of the bankruptcy act is declared to be 'to establish a uniform system of bankruptcy throughout the United States.' The fundamental element in other systems of bankruptcy has been to provide for and regulate the distribution of the bankrupt's property among his creditors, and to do this by means of agencies created by the act. The very moment an act of congress, establishing a uniform system for the administration of an insolvent estate, takes effect, every local and private system for the administration of same estates is necessarily superseded. Both systems cannot operate side by side as respects the same estates. The one must necessarily supersede the other, and the state and voluntary systems must yield to the system established by congress."

See In re Gutwillig, 90 Fed. 475.

This decision, confirmed by the circuit court of appeals, Second circuit (34 C. C. A. 377, 92 Fed. 337), as is also In re Sievers, 34 C. C. A. 372, 92 Fed. 325, confirmed by the circuit court of appeals, Eighth circuit, under the changed title of Davis v. Bohle, is in conflict with the decision of the circuit court of appeals, Fifth circuit, in Re Abraham. See, also, in support of the proposition, as laid down in Re Gutwillig, 90 Fed. 475: In re Francis-Valentine Co., 93 Fed. 953; In re John A. Etheridge Furniture Co., 92 Fed. 331; In re Smith, Id. 135; Lea v. George M. West Co., 91 Fed. 237; In re Brown, Id. 358; In

re Pittelkow, 92 Fed. 901; Carpenter v. O'Connor, 16 Ohio Cir. Ct. R. 526.

The above summary of cases, reported during the first year of the present bankruptcy law, makes it possible to deduce some generalizations which should control the court's decision in the case at bar. An injunction after adjudication is always discretionary, provided the cause of action is dischargeable in bankruptcy, and should surely be granted (1) if the bankrupt is threatened with arrest; (2) if the suit is not yet in judgment, and even after judgment, if the rights of the general creditors, not parties to the suit, will be jeopardized by further proceedings in the state courts; (3) or if the judgment is founded on the transaction, which is an act of bankruptcy, or a fraud on creditors, or the law. It should never be granted after the judgment has ripened into an execution sale, provided the state court has, or can be given, jurisdiction of all parties interested in the distribution, including the general creditors represented by the trustee in bankruptcy. See Black, Bankr. pp. 8–10; Branden. Bankr. pp. 26, 194, 415; Coll. Bankr. pp. 12–17; Bush, Bankr. pp. 33–38; Bump, Bankr. p. 283; Loveland, Bankr. p. 75. Courts of the United States are forbidden "to stay proceedings in any court of a state except in such cases where such injunctions may be authorized by any law relating to proceedings in bankruptcy." Rev. St. U. S. § 720; Haines v. Carpenter, 91 U. S. 254; Dial v. Reynolds, 96 U. S. 340; Peck v. Jenness, 7 How. 625. The act of 1898 (section 2, subsec. 15) expressly authorizes "the court of bankruptcy to make such orders, issue such process and enter such judgments, in addition to those specifically provided for * * * the enforcement of the provisions of this act." "To bring in and substitute additional persons, or parties, in proceedings in bankruptcy, when necessary for the complete determination of a matter in controversy." Id. subsec. 6. "To cause the estates of bankrupts to be collected, reduced to money, and distributed, and determine controversies in relation thereto, except as herein otherwise provided." Id. subsec. 7.

Applying the above-cited authorities to the facts in the case at bar, I am clearly of the opinion that when the superior court of Guilford county declared the deed of assignment made by Benbow, the bankrupt, to Cox, assignee, on the 23d day of January, 1894, null and void, as being in fraud of his creditors, the property attempted to be conveyed by Benbow to Cox, assignee, eo instante vested, by operation of the bankruptcy law, in the Southern Loan & Trust Company, the trustee of the said bankrupt.

It cannot be successfully maintained that the decree entered by the superior court of Guilford county was procured in good faith. All the evidence and the circumstances surrounding the proceedings point to the fact that it was a collusive judgment. It is manifest that, if the court had been apprised of the fact that Benbow had been adjudicated a bankrupt in the month of April preceding the rendition of this decree; that a trustee of his estate had been appointed, who was empowered, under the act, to take charge of the property and estate of the bankrupt; and that Charles D. Benbow, son of the bankrupt, and one of the beneficiaries under the deed of assignment to

Cox, was actually, at the time of the signing of this decree, the sole and only plaintiff in the pending cause, and that as a matter of fact there were "no several plaintiffs" among which priorities of liens were to be waived, as erroneously stated in the decree, but only the one plaintiff,—the court would not for one moment have entertained jurisdiction.

It is significant, in this connection, to note that the two wards of Benbow, Oliver C. and William C. Benbow, also beneficiaries under the Cox assignment, appear to have had no representative in this proceeding to protect their interests; and that Cox, the assignee, at the hearing of the matter, June term, 1899, of the superior court of Guilford county, made no effort to protect their interests, under the deed of assignment, as it was most certainly his legal duty to have done, but, on the contrary, assents to the judgment declaring the deed made to him in trust for the said wards null and void, and a fraud upon the creditors of Benbow. In the undue haste exhibited to procure this decree, the interests of these wards appear to have been entirely lost sight of by Cox and D. W. C. Benbow, the bankrupt. While there is no direct evidence that the bankrupt is the actual owner of the judgments taken by the five creditors who filed the five separate creditors' bills, there is sufficient evidence to make out a prima facie case for the petitioner,—the trustee of the bankrupt, Benbow,—and this court most certainly has the jurisdiction and power to inquire into this matter, with a view of ascertaining whether fraud has been perpetrated upon the creditors of the said Benbow. On that day, the 23d day of January, 1894, the title passed from D. W. C. Benbow, bankrupt, to J. S. Cox, his trustee, by deed of assignment, and at the same time possession of that property was transferred to said Cox, as appears from the evidence, and the title and possession remained in the said Cox, trustee, until the decree of the June term of the superior court of Guilford county was made, when the deed of assignment was set aside, as being a fraud on the creditors of the said D. W. C. Benbow. That the decree directed that the property be sold to satisfy certain alleged prior liens has no bearing on the question of title. The decree of the court at June term, 1899, declares that the title of J. S. Cox, trustee, was void ab initio. That being so, it is clear that the title to the property alleged to have been assigned remained in Benbow at the date of his adjudication in bankruptcy, on April 5, 1899, when, by operation of law, the title to the property in question passed to the Southern Loan & Trust Company, his trustee in bankruptcy. This title is held by the trustee in bankruptcy, subject, of course, to any equitable and valid liens that existed against the property in the hands of the bankrupt.

In Eyster v. Gaff, 91 U. S. 521, which the able counsel for Charles D. Benbow and D. W. C. Benbow insists fully sustains their contention, Justice Miller says:

"It may be conceded, for the purpose of the present case, that the strict legal title to the land did not pass to the assignee upon his appointment."

Again, on page 525, Justice Miller says:

"It is the duty of that court to proceed to a decree as between the parties before it, until, by some proper pleadings in the case, it was informed of the

changed relations of any of those parties to the subject-matter of the suit. * * * It is almost certain that if, at any stage of the proceedings before a final confirmation, the assignee [in bankruptcy] had intervened, he would have been heard to assert any right, or set up any defense, to the suit."

The facts in the case of Eyster v. Gaff are unlike those in the case at bar. In the case of Eyster v. Gaff, the property had been sold to Gaff, and a master's deed to him had been confirmed by a court of competent jurisdiction; while in the case at bar the sale of the property in question had only been ordered, and in a decree rendered in the state court, manifestly procured by collusion, as between Benbow, the bankrupt, and Charles D. Benbow, one of the defendants in the case when the decree was entered.

Chief Justice Taney, in Nugent v. Boyd, 3 How. 426, says:

"I am of the opinion that in a case where a creditor calls in question the validity of a mortgage held by another creditor it is the duty of the said court to exercise discretion over the question involved."

The contention of the respondents that Reagan, the receiver appointed by the clerk of the superior court of Guilford county, in proceedings supplementary to execution instituted by the National Bank of Greensboro, of which bank he was a director at the time, is entitled to the custody of this property by virtue of his appointment as receiver, May 2, 1894, is not tenable. The legal effect of granting a restraining order and the appointment of a receiver in proceedings supplemental to execution is ordinarily to vest the receiver with the property and effects of the judgment debtor from the time of the filing of such order, and disables the debtor from transferring the title thereto. Code N. C. § 494; Rose v. Baker, 99 N. C. 323, 5 S. E. 919; Mayer v. Hellman, 91 U. S. 497; Coates v. Wilkes, 94 N. C. 180.

In the case last cited (Coates v. Wilkes) the court says:

"The general principles of law applicable to receivers apply to receivers appointed under supplemental proceedings. It is the duty of such receivers to take possession of the property of the debtor at once, and to bring actions to recover any property belonging to him which may be in the hands of third persons, and particularly to recover property conveyed to third parties fraudulently as to creditors." Bank v. Stevens, 169 U. S. 459, 18 Sup. Ct. 403.

When Reagan was appointed receiver in the proceedings supplementary to execution, by the clerk of the superior court of Guilford county, May 2, 1894, the property described in the deed of assignment to Cox was in the possession of said Cox. Reagan had neither active nor constructive possession. It appears that under the order appointing him he was vested with nothing more than the right to bring action to reduce to possession certain notes alleged to have been transferred by D. W. C. Benbow to his son Charles D. Benbow the day before his assignment, and to reduce to possession the property assigned to Cox, assignee, which was at all times in the possession of the said Cox. He appears to have been a mere receiver, without power and without title. 20 Am. & Eng. Enc. Law, p. 67. For five years following his appointment as receiver it appears that he took no steps to reduce the property of Benbow, and assigned by Benbow to Cox, to possession, except his suit for the possession of the Fisher and Ross notes; the last-named party, Cox, continuing, as the evi-

dence shows, to manage the property and collect rents and profits from the same.

In Olney v. Tanner, 10 Fed. 101, Judge Brown held that the receiver had no title as against the trustee of the bankrupt, because, after his qualification, he had for six months taken no steps to set aside the fraudulent transfer, and meanwhile bankruptcy had intervened. In Andrews v. Smith, 5 Fed. 833, in a suit in the United States circuit court by the first mortgage bondholders of the Vermont Central Railroad against the mortgage trustees, it was held that the receivership in the state court had practically ceased prior to the period covered by the accounting claimed in this case, and that the state court had so determined, and, as the parties themselves had brought the receivership to a close by their own acts, no formal entry in court of such discharge was necessary, and that the pendency of such proceedings would be no bar to this suit. In this case it was also held that the rule of comity towards the state court could not operate to deprive this court of its own rightful jurisdiction. The United States court of this district, sitting in bankruptcy, is charged with the protection of the interests of creditors of the bankrupt throughout the whole country. Its discharge of the bankrupt here is operative in all the states, and, as the interests with which the court is charged with protecting are not local, but national, there would seem to be no good reason why a United States court in bankruptcy, sitting in this state, should be bound to aid an officer of a state court in securing a preference over other creditors owning same, any more than if the bankruptcy proceedings happened to be in a similar court charged with the same duties, and in favor of the same creditors, sitting in a state adjoining, or in the District of Columbia. We quote from the opinion (Olney v. Tanner, supra):

"The essential point in the decision of Booth v. Clark, 17 How. 322, is that a receiver holding the property not reduced to possession, and not supported by any assignment from the debtor, is not such a title as will prevail in independent tribunals against the interests of the creditors entitled to its equal protection, and, if this doctrine is applied as regards the undisputed property of the debtor, it would still seem to be more applicable to cases where a fraudulent assignment stands in the receiver's way." "Such a receiver represents his judgment creditor only, and, like a receiver in a judgment creditors' bill, does not become vested with the title to such property, except through an action to which the fraudulent assignee is a party. Upon the authority of Booth v. Clark, Id., I think there is much doubt whether the appointment as receiver and officer of a state court has any such standing in a court of the United States, sitting in bankruptcy, as entitles him to its aid in a case like this, seeking a preference in contravention of the intent and policy of the bankrupt act."

Moreover, it appears that in Reagan's suit, to recover the Fisher and Ross notes, there was a judgment adverse to him, and he was taxed with the costs, which judgment, while it may not have wholly discharged him as receiver, certainly terminated his duties and functions as such. 20 Am. & Eng. Enc. Law, p. 217. The appointment of Reagan, made, as it was, at the suggestion of the bankrupt, Benbow, and made while Reagan was acting as director in the bank,—the National Bank of Greensboro,—the judgment creditor, which instituted the proceedings supplementary to execution, the sale of the judgment pending

the receivership to the son of the bankrupt, Charles D. Benbow, and the activity displayed by Reagan in purchasing claims against the bankrupt for the benefit of the bankrupt and his son Charles D. Benbow, indicate very strongly that Reagan was acting with Benbow in his efforts to secure absolute control of certain judgments against the estate.   It is significant that his appointment as receiver appears to have been entirely ignored when the "consent decree" was made by the superior court of Guilford county, June term, 1899; nor does the court now understand that the said Reagan has asserted any claim to the custody or title to the estate of the bankrupt by virtue of his appointment as receiver, May 2, 1894, or is now asserting the same.   It appears to be the contention of the bankrupt and Charles D. Benbow, one of the respondents in this case.   Clearly, in my opinion, Reagan, as receiver, has no right or title to the custody or possession of the property described in the schedules in bankruptcy of D. W. C. Benbow; and it is equally clear that the trustee in bankruptcy cannot be compelled to go into a state court, and petition for the possession and control of property that vested in him by operation of the bankruptcy law, and especially in proceedings when a fraud was practiced upon the state court in procuring its decree.   Nor can there be any question but that the bankruptcy court, in the exercise of its discretion, may authorize a bankrupt's trustee to sell all property of the bankrupt free from liens and incumbrances, and may preserve and transfer bona fide liens to the fund arising from the same.

In the case of Houston v. Bank, 6 How. 504, it was held that, under the bankrupt act of 1841, the district courts have power to order the sale of the property of the bankrupts under mortgage, and make title free from the mortgage, marshaling and disposing of the proceeds according to the priorities of those interested.   Chief Justice Taney says:

"The power of the district court over mortgages in cases of bankruptcy was fully argued and considered in the two cases reported in 3 How. 292 and 426 (In re Christy, and Nugent v. Boyd), as appears by the opinions delivered by the court, and the chief justice, who dissented.   But whatever differences of opinion existed as to some of the propositions maintained in these cases by the majority of the court, there has been no division of opinion upon the question like the one presented in this record; and the courts are unanimously of opinion that the sale made by the assignee of property in question is valid, and that the purchasers are entitled to hold it free and discharged of the mortgage of the City Bank, and free of all other incumbrances mentioned in the proceedings."

In the case of In re Kirtland, 10 Blatchf. 515, Fed. Cas. No. 7,851, before the district court in the Southern district of New York, Woodruff, J., in the course of the opinion (page 516), says:

"There is no doubt of the power of the court to order a sale of land free of the incumbrances thereon, and the proceeds will stand as a substitute for the lands themselves, for the benefit of those holding liens to the extent of their interests therein, and, as to the surplus, for the benefit of the general creditors."

Black, in his work on Bankruptcy, is of the opinion that such sale can be made free of incumbrances.   See notes on page 161.   Bump,

in his work on Bankruptcy (11th Ed.), edited by Williams, is of the same opinion. See notes and authorities cited on pages 514–517.

Under the act of 1898, so far as I have been able to examine, the decisions are uniform to the effect that the district courts are invested with such jurisdiction, at law and equity, as will enable them to exercise jurisdiction in bankruptcy proceedings, and that the bankruptcy act is remedial, and should be interpreted reasonably, and according to a fair import of its terms, with a view to effect its objects and to promote justice. In re Bruss-Ritter Co., 90 Fed. 651; In re Christy, 3 How. 292; Nugent v. Boyd, Id. 426; Houston v. Bank, 6 How. 504.

It is insisted by the able counsel for the respondents that D. W. C. Benbow, having been discharged by proceedings in bankruptcy, cannot now be enjoined. This position cannot be sustained. Loveland on Bankruptcy (page 612) says: "A discharge in bankruptcy is in the nature of a personal privilege granted to a debtor, in consideration of his yielding up all of his property for distribution among his creditors." A bankruptcy proceeding is a proceeding in rem, and all persons interested in the res are regarded as parties to the bankruptcy proceedings. These include the bankrupt and the trustee, as well as creditors of the bankrupt, both secured and unsecured. Carter v. Hobbs, 92 Fed. 594. The case of Herzberg, cited for counsel for respondents in support of this position, and reported in 25 Fed. 699, is not, in the opinion of the court, applicable to this case.

It is therefore ordered that D. W. C. Benbow, the bankrupt, and all persons acting at his instance, at once comply with the written demands of the trustee, the Southern Loan & Trust Company, made on the 17th day of August, 1899, and the 19th day of August, 1899. It is further ordered and adjudged that the said Southern Loan & Trust Company, trustee of the said D. W. C. Benbow, bankrupt, is hereby authorized and empowered to sell the property of the said bankrupt, D. W. C. Benbow, free from all incumbrances (first having set apart to him the exemptions allowed by law), for cash, to the highest bidder, after having advertised the same in each county where said property may be located, in some newspaper published in the said county, for four successive weeks preceding said sale. It is further ordered and adjudged that the proceeds realized from the said sale stand as a substitute for the lands and property sold, and be held by the trustee for the benefit of those holding bona fide claims and liens, to the extent of their interest therein, and as may hereafter be established. It is further ordered that the Southern Loan & Trust Company, trustee as aforesaid, file a bond, in lieu of the one now on file, in the sum of $25,000, which said bond shall be approved by the clerk of this court at Greensboro, N. C. And this cause is retained for further orders.